IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-00242-MEH

ANDREA HAMMOND, J.D.,

  Plaintiff,

v.

INTERVENTION,
ICCS (Intervention Community Correction Services), a subsidiary of Intervention,
GREG KILDOW, CEO of Intervention,
ALL THE BOARD OF DIRECTORS OF INTERVENTION, and
GERI ANN ECHLENBERG, Case Manager at ICCS,

  Defendants.

---

## ORDER ON MOTION FOR SUMMARY JUDGMENT

---

**Michael E. Hegarty, United States Magistrate Judge**.

  Before the Court is Defendants' Motion for Summary Judgment [filed March 29, 2015; docket #83]. Pursuant to 28 U.S.C. § 636(c)(1) and D.C. Colo. LCivR 72.2, the parties consented to the jurisdiction of this Court. *See* docket #55. The motion is fully briefed, and oral argument would not materially assist the Court in its adjudication. For the reasons that follow, the Court **GRANTS** the Defendants' motion.

## BACKGROUND

### I. Procedural History

  Plaintiff, proceeding *pro se*, initiated this action on January 28, 2014 against Intervention Community Correction Services ("ICCS"), Greg Kildow, CEO, All the Board of Directors of ICCS,

and Geri Anna Echlenberg,[1] Case Manager at ICCS (collectively "Defendants").   Docket #1.

Pursuant to a court order during initial review, Plaintiff subsequently filed an Amended Prisoner

Complaint on February 26, 2014, then a Second Amended Complaint on March 24, 2014, and the

operative Third Amended Complaint on August 5, 2014.  Dockets ##11, 14, 49.   On September 30,

2014, this Court granted the Defendants' motion to dismiss Plaintiff's Claim 2 for violation of the

Fourteenth Amendment to the U.S. Constitution; Claim 3 for Duress; and Claim 4 for violation of

the Americans With Disabilities Act ("ADA"), but allowed Plaintiff's Claim 1 for violation of the

Eighth Amendment to the U.S. Constitution to proceed.  Docket #59.

The Plaintiff filed motions regarding discovery issues after the discovery cutoff, which the

Court resolved on April 27, 2015.  Meanwhile, the Defendants timely filed the present motion on

March 29, 2015; however, based on disposition of the discovery issues, the Court allowed

supplemental briefing, which was completed on May 14, 2015.  Essentially, Defendants contend that

Plaintiff cannot establish any genuine issue of material fact to allow her to proceed to trial.  Plaintiff

counters that certain medical records, once obtained, would reveal the truth of the allegations in her

complaint and that the attached records demonstrate she suffered from asthma and she was instructed

by a doctor at the time she was housed at Intervention that she should not be placed in a smoking

room.   Defendants reply that Plaintiff provided no evidence demonstrating a material issue

concerning whether Intervention or its staff were deliberately indifferent or subjected her to cruel

and unusual punishment.

Following a discovery motion hearing on April 27, 2015, the Court permitted the parties to

---

[1]The record reflects that the case manager's name, as identified by the Plaintiff, may be spelled incorrectly; however, because it has not been corrected by the Defendants, the Court will rely on the Plaintiff's spelling and identification of her case manager.

file supplemental briefs.  Defendants contend the Plaintiff's allegations that she was exposed to second-hand smoke from the patio or from people smoking in the building are unfounded and the evidence shows otherwise.  Plaintiff argues that Defendants' evidence, particularly the photograph of the smoking patio, was "wrong" in that the tables shown in the photo were actually closer to the door leading into the building and both that door and the interior door were propped or held open so that smoke invaded the day room and laundry room "on a regular basis."  Moreover, she asserts the records of smoking violations provided by Defendants did not include the period Plaintiff resided at Intervention, and a record dated August 27, 2013 reflects Plaintiff's case manager conceding that "ICCS has concerns about [Plaintiff's report of cigarette smoke triggering a potentially serious asthma attack] due to the fact that they cannot stop people from smoking and cannot accommodate a non-smoking room."

## II.     Findings of Fact

The Court makes the following findings of fact viewed in the light most favorable to the Plaintiff, who is the non-moving party in this matter.[2]

1.      Plaintiff, an incarcerated person, suffers from asthma; an asthma attack may be triggered by allergens.  Third Amended Complaint ("TAC"), docket #49 at 5.

2.      Plaintiff was seen at Wyoming Medical Center in March 2012 for an "acute allergic reaction with broncospasm"; she was in "significant distress" and required epinephrine to improve.  Docket

---

[2]Typically, in the summary judgment context, a pro se litigant's verified complaint may be treated as an affidavit as long as it satisfies the standards for affidavits outlined in Rule 56.  *See Adams v. Dyer,* 223 F. App'x 757, 764 n.7 (10th Cir. 2007) (citing *Conaway v. Smith,* 853 F.2d 789, 792 (10th Cir. 1988)).  Therefore, the Court will consider the Plaintiff's allegations in her Third Amended Complaint.  *See Franklin v. Kansas Dep't of Corrs.*, 160 F. App'x 730, 734 (10th Cir. 2005) ("An amended complaint supersedes the original complaint and renders the original complaint of no legal effect.") (citing *Miller v. Glanz*, 948 F. 2d 1562, 1565 (10th Cir. 1991)).

#96-1 at 4-6.  The doctor refilled Plaintiff's albuterol inhaler and gave her an EpiPen with one refill advising Plaintiff that she "needs to have this EpiPen with her at all times."  *Id.*

3.      Plaintiff was a resident at Defendant Intervention Community Corrections Services' ("ICCS") Lakewood Facility, a community corrections program for women, from August 2, 2013 to August 30, 2013.  *Id.*; *see also* Def. Exh. E, docket #83-6.

4.      ICCS provides transition services from incarceration with the Colorado Department of Corrections ("CDOC") back into the community.  Residents, also known as "clients," reside at ICCS for the time remaining on their respective CDOC sentences prior to parole.  They are required to abide by all ICCS rules and regulations, or face discipline under the Code of Penal Discipline, which may result in their return to the CDOC.  Affidavit of Kristin Heath, March 27, 2015 ("Heath Affadavit"), ¶ 6, docket #83-2.

5.      On arrival, Plaintiff was listed as having allergies, asthma, and respiratory problems, and as taking required medication including Neurontin, Albuterol (rescue inhaler) and "Qvar."  Docket #83-4 at 2-3; docket #49 at 3-4.

6.      Plaintiff was placed in a room with five other residents who smoked cigarettes.  Docket #49 at 5.

7.      Smoking was not permitted in the building at ICCS, but was permitted outside on an adjoining 750-square-foot patio where residents could sit at tables and smoke.  Heath Affidavit, ¶¶ 8, 10; *see also* ICCS Rules of Conduct and House Policies, docket #83-5 at 23.

8.      On August 6, 2013, Plaintiff submitted an ICCS Grievance Form to administration complaining about using her rescue inhaler "at an unprecedented rate" because of her exposure to cigarette smoke/odors when her roommates came in from smoking on the patio.  Docket #83-7 at 2.  Plaintiff conceded that "smoking is only allowed on the patio" and "I can avoid the smoking

directly" at ICCS, but claimed that following a previous exposure to cigarette smoke, she was taken to the hospital by ambulance where she "had to be intubated and resuscitated." *Id.* Plaintiff requested a "sleeping bedroom specifically designated for residents who aren't smokers to help prevent health problems for those of us who are allergic to cigarette smoke." *Id.*

9.     ICCS Program Director, K. Heath, responded to Plaintiff's grievance on August 7, 2013 asking Plaintiff to "provide medical documentation of your condition and what accommodations are required to your case manager." *Id.* ICCS policy requires that "[r]oom and bed change requests will not be accepted. Exceptions may be made for documented medical conditions." ICCS Rules of Conduct and House Policies, docket #83-5 at 21.

10.     That same day, Plaintiff reported to her case manager, Defendant Echlenberg, that she was "deathly allergic to cigarettes" and that, "even though [her roommates] were not smoking in her room, she [was] still having problems [such as] itchy eyes, stuffed nose and using rescue inhaler a lot." Docket #83-6 at 3.

11.     In the late evening of August 7, 2013, an ICCS staff member reported being called to a bathroom in which the Plaintiff lay on the floor saying that she felt sick to her stomach and "just went to the floor." The staff member reported getting Plaintiff some juice and after Plaintiff drank it, "[s]he was able to stand up and walk to her bed and stated that the juice made her feel much better." Docket #83-6 at 3.

12.     On August 14, 2013, Defendant Echlenberg reported that Plaintiff was "approved to use the security phone today or tomorrow to call Dr." Docket #83-6 at 5.

13.     On August 21, 2013, Echlenberg noted that Plaintiff reported to her "she needs to [get] letter from MCPN so that she can get inhailer [sic] as well as allergic letter." Docket #83-6 at 7. Plaintiff also reported that "she was up until 12:30am weezing [sic] because of smoke." *Id.*

14.     That same day, Plaintiff submitted another ICCS Grievance Form, in which she again complained about being exposed to cigarette smoke in her room by "5 heavy smokers" whose "hair, clothes, etc. smell continuously of cigarette smoke" and cause Plaintiff to "have trouble breathing and stay up many hours wheezing and using [her] rescue inhaler in hopes of avoiding a trip to the emergency room." Docket #83-8. She also explained that she could not get documentation of her health conditions from her last doctor, who required more than $40 for the cost, and asked why ICCS could not get Plaintiff's records from the CDOC. *Id.* Plaintiff requested that she be housed "in a 100% non-smoker room." *Id.*

15.     On August 24, 2013 at 16:45, ICCS staff noted Plaintiff "is requesting to go to St. Anthony's by ride for severe difficulty breathing. 3 hr pass, ext if verified." Docket #83-6 at 8. Later, at 21:28, staff noted that Plaintiff "has returned from the hospital" and "brought dr's note stating that she 'should not be in a room where there is smoking, please place her in a nonsmoking location.' All rooms are N/S[;] per on call, place Hammond in 315B until further direction." *Id.*; *see also* August 24, 2013 Doctor's Note, docket #83-9 at 3.

16.     Director Heath attests that "[o]n August 24, 2013, ICCS-West staff moved [Plaintiff] temporarily to a small room with nonsmokers. Staff then proceeded to question residents to find nonsmokers and moved Ms. Hammond and the nonsmokers to a regular residential room for permanent housing on August 26, 2013." Heath Affidavit, ¶¶ 11, 19, docket #83-2.

17.     On August 27, 2013, Director Heath responded to Plaintiff's August 21 grievance saying, "The documentation you turned in over the weekend states that you should be in a nonsmoking location. All rooms in the building are nonsmoking, so any room can accommodate this. While temporary changes have been made in [an] attempt to place you with nonsmoking clients, this will not be a permanent change without more specific documentation." Docket #83-8.

18.     Also on August 27, 2013, ICCS staff noted, "Team is concerned that [Plaintiff] may perceive manic episodes as her 'ideal functioning level' and that she may try to use her mental health issues as leverage to get what she wants. Client is also reporting that she is allergic to cigarette smoke, and that this could trigger a potentially serious asthma attack. ICCS has concerns about this due to the fact that they cannot stop people from smoking and cannot accommodate a non-smoking room. Docket #83-6 at 8.

19.     On August 29, 2013, ICCS staff noted, "Meeting was conducted with Resident. ... Client was confronted about her threats of suing the company for not giving her a non-smoking room. She was informed that if this continues to be an issue with her threatening a law suite [sic] every time she gets told no we are going to have issues. She was already moved to a non-smoking room and nothing more can be done about this."  Docket #83-6 at 9.

20.     That same day, Echlenberg noted Plaintiff's report that she "is running low of med's [sic] but see's [sic] Dr. Thomas Tuesday."  *Id.*

21.     Also that day, Plaintiff submitted a third grievance explaining her conduct in entering the second floor without permission, which resulted in an incident report.  ICCS Grievance Form, August 29, 2013, docket #83-10.  Director Heath responded on August 30, 2013 reminding the Plaintiff of the posted signs reflecting the floor number and giving her a verbal warning.  *Id.*

22.     On August 30, 2015, ICCS staff noted Plaintiff apparently left the building and "was placed on Escape status at 6:36pm."  Docket #83-6 at 11.

## LEGAL STANDARDS

### I.     Treatment of a *Pro Se* Plaintiff's Complaint

A federal court must construe a *pro se* plaintiff's "pleadings liberally, applying a less stringent standard than is applicable to pleadings filed by lawyers. [The] court, however, will not

supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on plaintiff's behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997) (quotations and citations omitted).  The Tenth Circuit interpreted this rule to mean, "if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so despite the plaintiff's failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  However, this interpretation is qualified in that it is not "the proper function of the district court to assume the role of advocate for the pro se litigant."  *Id.*; *see also Peterson v. Shanks*, 149 F.3d 1140, 1143 (10th Cir. 1998) (citing *Dunn v. White*, 880 F.2d 1188, 1197 (10th Cir. 1989)).

## II.    Dismissal under Fed. R. Civ. P. 56

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003).  The Court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the Court the factual basis for its motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial."  *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002).  Only admissible evidence may be considered when ruling on a motion for

summary judgment. *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).

The non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, if the movant properly supports a motion for summary judgment, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original) (citation omitted); *see also Hysten v. Burlington Northern & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324). "[T]he content of summary judgment evidence must be generally admissible and ... if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## ANALYSIS

In her remaining claim, Plaintiff alleges the Defendants violated the Eighth Amendment by failing to provide medical care and to accommodate her room request following two asthma attacks.

Under the Eighth Amendment, prisoners are constitutionally entitled to "humane conditions

of confinement guided by 'contemporary standards of decency.'" *Penrod v. Zavaras*, 94 F.3d 1399, 1405 (10th Cir. 1996) (quoting *Estelle v. Gamble,* 429 U.S. 97, 103 (1976)).  Accordingly, prison officials must "ensur[e] inmates receive the basic necessities of adequate food, clothing, shelter, and medical care and ... tak[e] reasonable measures to guarantee the inmates' safety." *Barney v. Pulsipher*, 143 F.3d 1299, 1310 (10th Cir. 1998) (citing *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994)).  Prisoners state a claim of cruel and unusual punishment under the Eighth Amendment by alleging prison officials demonstrated "deliberate indifference to a prisoner's serious illness or injury," or that prison officials "have, with deliberate indifference," involuntarily exposed a prisoner to conditions "that pose an unreasonable risk of serious damage to [the inmate's] future health." *Helling v. McKinney*, 509 U.S. 25, 35 (1993);  *Estelle,* 429 U.S. at 105.

Plaintiff must meet both the objective and subjective components constituting the test for deliberate indifference. *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006).  "The objective prong of the deliberate indifference test examines whether the prisoner's medical condition was 'sufficiently serious' to be cognizable under the Cruel and Unusual Punishment Clause." *Al-Turki v. Robinson*, 762 F.3d 1188, 1192 (10th Cir. 2014).  The Tenth Circuit established "[a] medical need is considered sufficiently serious to satisfy the objective prong if the condition 'has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Id.* at 1192-93 (quoting *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001)).

> Where a prisoner claims that harm was caused by a delay in medical treatment, he must "show that the delay resulted in substantial harm" in order to satisfy the objective prong of the deliberate indifference test. "We have held that the substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001). Thus, the "substantial harm" caused by a delay in treatment may be a permanent physical injury, or it may be "an intermediate injury, such as the pain experienced while waiting for treatment and analgesics." *Kikumura v. Osagie*, 461 F.3d 1269, 1292

(10th Cir. 2006). "Although 'not every twinge of pain suffered as a result of delay in medical care is actionable,' when the pain experienced during the delay is substantial, the prisoner 'sufficiently establishes the objective element of the deliberate indifference test.'" *Id.* (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000)).

*Id.* at 1193.

The subjective component is met if the Plaintiff demonstrates Defendants "knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Callahan*, 471 F.3d at 1159 (quoting *Kikumura*, 461 F.3d at 1293, *overruled on other grounds*, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)). The subjective component requires an "inquiry into a prison official's state of mind when it is claimed that the official has inflicted cruel and unusual punishment." *Kikumura*, 461 F.3d at 1293 (quoting *Farmer*, 511 U.S. at 838). This component is equivalent to "criminal recklessness, which makes a person liable when she consciously disregards a substantial risk of harm." *Beauclair v. Graves*, 227 F. App'x 773, 776 (10th Cir. 2007) (quoting *Mata v. Saiz*, 427 F.3d 745, 752 (10th Cir. 2005)). "A prisoner may satisfy the subjective component by showing that defendants' delay in providing medical treatment caused either unnecessary pain or a worsening of [the] condition." *Mata*, 427 F.3d at 755.

Here, the Plaintiff must demonstrate that Defendants were deliberately indifferent to a need for medical care for her health, and/or they involuntarily exposed her to conditions that posed an unreasonable risk of serious damage to her health.

## I.    Deliberate Indifference to Need for Medical Care

Defendants do not dispute that Plaintiff's asthma is sufficiently serious to meet the objective prong of an Eighth Amendment claim for deliberate indifference to a prisoner's serious illness or injury. *See Al-Turki*, 762 F.3d at 1192-93. They dispute, however, that they consciously disregarded a substantial risk of harm during Plaintiff's residence at ICCS.

11

Plaintiff attests (in the operative verified Third Amended Complaint)[3] that she had been

exposed to lingering cigarette smoke and/or odor at ICCS, which triggered her asthma:

> Twice she couldn't breathe so bad that she suffered two asthma attacks. Once she passed out during [sic] and fell on the floor and ICCS staff refused to call an ambulance for her. The second she had an asthma attack so [bad] that she had to go to the hospital for nebulizer treatments and medicine. This was following an episode where her rescue inhaler ran out and Ms. Hammond sought out her case manager to get permission to go see a doctor and get a refill, but was denied by [Defendant] Echlenberg.

Docket #49 at 5.  Plaintiff identifies the two asthma attacks as having occurred on August 7, 2013

and August 24, 2013.  The record reflects that on August 7, 2013, an ICCS staff member was called

to a bathroom in which Plaintiff lay on the floor complaining that she felt sick to her stomach and

"just went to the floor"; staff further reports that after drinking some juice, Plaintiff was able to stand

up and walk to her bed and stated that the juice made her feel much better."  Plaintiff, on the other

hand, attests that she had an asthma attack that caused her to "pass out" on that date.  However,

Plaintiff does not demonstrate any genuine issues of fact as to whether Defendants consciously

disregarded a serious risk of harm; there is nothing in the record, including in Plaintiff's verified

complaint, demonstrating there was any risk of harm on August 7, 2013.

That is, there is no indication that, as a result of Defendants' alleged conscious disregard of

Plaintiff's health (*i.e.*, Defendants' "refus[al] to call an ambulance"), Plaintiff suffered or may have

suffered harm.  No record reflects that, by failing to call an ambulance, or even by providing juice,

Defendants disregarded any substantial risk of harm; Plaintiff provides nothing demonstrating that

she was harmed, or there was a risk of harm, as a result of Defendants' actions (or inactions) with

regard to medical care and/or treatment on August 7, 2013.  Notably, a difference of opinion about

---

[3]Plaintiff's Third Amended Complaint is the only verified testimony provided by the Plaintiff in support of her response to the present motion. *See* Fed. R. Civ. P. 56(c).

the course of medical treatment will not constitute an Eighth Amendment violation. *Scott v. Gibson*, 37 F. App'x 422, 423 (10th Cir. 2002) (plaintiff's "assertions amounted only to a difference of opinion as to the need for medical ... treatment or the adequacy of any treatment, [therefore] Defendants' acts did not constitute deliberate indifference"); *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) ("a prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation"); *Estelle*, 429 U.S. at 107 (plaintiff who "suggest [ed] a number of options that were not pursued," when he saw medical personnel on seventeen occasions and was given medication to treat his high blood pressure and back pain, did not state an Eighth Amendment claim for deliberate indifference).

With respect to August 24, 2013, Plaintiff alleges she had to go to the hospital that day for treatment of an asthma attack after Defendant Echlenberg denied her the opportunity to go to the doctor for a refill of her inhaler. The undisputed record reflects that Echlenberg permitted Plaintiff to use the "security phone" on August 14 and 15, 2013 to call her doctor. Docket #83-6 at 5. On August 21, 2013, Plaintiff completed a grievance form explaining that her doctor was no longer in private practice, so her records were in storage and the doctor was going to charge her $40 per hour and 25 cents per page (which she did not have) to retrieve the records. Docket #83-8 at 3. Therefore, it does not appear that Echlenberg refused Plaintiff's request for access to a doctor on August 14-15, 2013. Further, the ICCS chronological notes reflect that on August 21, 2013, Plaintiff met with Echlenberg to whom Plaintiff complained she "was up until 12:30am weezing [sic] because of smoke" and "stated she is using [her] inhaler a few times a night." The same note reflects, "Medications- She only has 9 lamigtal [sic]"; however, this medication (correctly spelled,

"lamictal") is used to treat bipolar disorder.[4]  Plaintiff also filed a grievance on August 21, 2013 in which she mentions nothing about her asthma medication or whether she had been permitted to obtain refills.  The only record indicating Plaintiff's concern about the amount of her medications is dated August 29, 2013, in which Echlenberg noted that Plaintiff was "running low on meds but sees Dr. Thomas on Tuesday"; however, this report occurred *after* Plaintiff had been to the hospital on August 24.

Consequently, the only evidence supporting Plaintiff's allegation that her severe asthma attack on August 24, 2013 occurred following Echlenberg's refusal to permit Plaintiff to obtain a refill of her asthma medication is Plaintiff's own statement in her verified complaint.  However, a "nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient."  *Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995) (quoting *Hall*, 935 F.2d at 1111).  Plaintiff's statement that her asthma attack "was following an episode where her rescue inhaler ran out and [she] sought out her case manager to get permission to go see a doctor and get a refill, but was denied" is both conclusory (she fails to describe the timing, context and circumstances of the request and denial) and self-serving.  *See, e.g. Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1203 (10th Cir. 2015) (upheld district court's finding that a plaintiff's statements countering the defendant's evidence that she "did work more than 50 hours during [a certain time period]" were conclusory).  Therefore, the Court must conclude summary judgment is proper as to Plaintiff's Eighth Amendment claim for deliberate indifference to a need for medical care.

_____

[4]Plaintiff concedes in an "Offender Letter," which was used to support her application for residency at a community corrections center, that she suffers from "bi-polar disease."  Docket #83-3 at 7.

## II.    Deliberate Indifference to Conditions Posing an Unreasonable Risk of Serious Damage

For this portion of Plaintiff's claim, Defendants argue that no issues of material fact exist as to whether they, with deliberate indifference, involuntarily exposed Plaintiff to conditions "that pose an unreasonable risk of serious damage to [her] health." Plaintiff attests:

> Defendants wantonly subjected Ms. Hammond to cigarette smoke by allowing it on the premises and failing to enforce no smoking rules, and by placing her in a bedroom with 5 smokers. Ms. Hammond had difficulty breathing, her throat swelled up, her eczema was exacerbated, and she had itchy eyes and runny nose.
>
> ...
>
> Staff ridiculed Ms. Hammond's medical condition calling her "Rainman" and "the boy in the bubble." The day of her asthma attack two staff joked about whether they would make Ms. Hammond walk to the bus or if they would call an ambulance for her – sending Ms. Hammond into a panic attack fearing she would die before help came.

Docket #49 at 5. "To prevail on a 'conditions of confinement' claim under the Eighth Amendment, an inmate must establish that (1) the condition complained of is 'sufficiently serious' to implicate constitutional protection, and (2) prison officials acted with 'deliberate indifference to inmate health or safety.'" *Reynolds v. Powell*, 370 F.3d 1028, 1031-32 (10th Cir. 2004) (quoting *Farmer*, 511 U.S. at 834).

To satisfy the objective prong of the *Farmer* test, "a prisoner must show that 'conditions were more than uncomfortable,' and instead rose to the level of 'conditions posing a substantial risk of serious harm' to inmate health or safety." *Despain v. Uphoff*, 264 F.3d 965, 973 (10th Cir. 2001) (quoting *Farmer*, at 834); *see also Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). The Eighth Amendment's prohibition on cruel and unusual punishment "'does not mandate comfortable prisons,' and conditions imposed may be 'restrictive and even harsh.'" *Barney v. Pulsipher*, 143 F.3d 1299, 1311 (10th Cir. 1998) (quoting *Rhodes*, 452 U.S. at 347). Whether the condition complained of is sufficiently serious is evaluated on an objective basis. *Barney*, 143 F.3d at 1310.

The relevant inquiry involves a review of the "circumstances, nature, and duration" of the conditions with "the length of exposure to the conditions ... of prime importance." *DeSpain*, 264 F.3d at 974; *see also Barney*, 143 F.3d at 1311-12.

Deliberate indifference means that "a prison official may be held liable ... only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847.  Mere negligence does not violate the Eighth Amendment. *Berry v. City of Muskogee*, 900 F.2d 1489, 1495 (10th Cir. 1990) (deliberate indifference "must involve more than ordinary lack of due care for the prisoner's interests or safety"). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 847.

Plaintiff's allegation that she was housed in a room with five smokers is not disputed.  Also undisputed is that Plaintiff remained in that room from April 2, 2013 (her arrival) to April 24, 2013 (the date she submitted a doctor's note), despite repeated complaints that she was suffering allergy symptoms and difficulty breathing.  Defendants dispute Plaintiff's allegations that they "allowed smoking on the premises" (i.e., inside the building) and "failed to enforce no smoking rules."  The Court finds these disputed allegations are conclusory and unsupported as set forth below.  *See Murray*, 45 F.3d at 1422.

In *Helling v. McKinney*, 509 U.S. 25 (1993), the Supreme Court addressed whether the health risk posed by involuntary exposure of a prison inmate to environmental tobacco smoke can form the basis of a claim for relief under the Eighth Amendment. *Id.* at 27-28.  In that case, however, the Court focused on whether the Eighth Amendment protects against *future* harm to inmates; there, the plaintiff sought an injunction alleging that his cellmate smoked five packs of cigarettes a day, which

subjected him to future health problems caused by exposure to the smoke. *Id.* at 28-29. The Court's directions to the trial court involved consideration of evidence necessary to support an award of prospective injunctive relief. *Id.* at 35-36 (including the plaintiff's transfer out of the cell and the administration of a non-smoking policy that would minimize exposure to tobacco smoke). In addition, there is no indication in *Helling* that the plaintiff alleged he was allergic to or otherwise susceptible to health issues caused by tobacco smoke. *See id.* at 36 (Court required the trial court to "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk.") (emphasis in original).

Accordingly, *Helling* is factually distinct from the present case. *See Cassady v. Wilkes*, 519 F. App'x 677, 679 (11th Cir. 2013) (where a prisoner alleged his exposure to cigarette smoke caused both present and future harm, the court recognized the Eighth Amendment prohibits deliberate indifference both to a prisoner's *existing* serious medical needs and to conditions posing a substantial risk of *future* harm); *see also Walker v. Godinez*, 912 F. Supp. 307, 312 n.8 (N.D. Ill. 1995) (court distinguished case from *Helling* as plaintiff suffered immediate harm from exposure to cigarette smoke). In fact, the Seventh Circuit, in interpreting *Helling*, distinguished between inmates seeking injunctive relief to prevent future harm and those claiming immediate harm. *Oliver v. Deen*, 77 F.3d 156, 159 (7th Cir. 1996).

Significant to this case, the Seventh Circuit also distinguished between a "normal" prisoner and one "who ha[s] asthma or some other serious respiratory condition that even a low level of ambient smoke would aggravate." *Powers v. Snyder*, 484 F.3d 929, 932 (7th Cir. 2007). However, in that case, the plaintiff alleged he was housed "in a unit with 48 smoke cells and 2 non-smoke [cells] and a day room full of smoke." *Id.* The court cautioned "it is by no means certain that the

plaintiff has a meritorious claim," and concluded "maybe there's a level of ambient tobacco smoke that, whether or not it creates a serious health hazard, inflicts acute discomfort amounting, especially if protracted, to punishment." *Id.* at 932-933.

The Tenth Circuit answered this question for an asthmatic inmate who alleged that prison guards smoked on the porch of the housing units and, every time he entered or exited the building, he was exposed to second-hand smoke. *See Johnson v. Lappin*, 478 F. App'x 487 (10th Cir. 2012). The plaintiff supplied a log of the number of times he was exposed to smoke, which the court calculated as "a few brief occasions of exposure per week over a period of six months." *Id.* at 490. The plaintiff also alleged that he suffered headaches, fatigue, allergies, constant runny nose, blurry vision and "excruciating pain associated with asthma attacks." *Id.* The court concluded that Johnson's allegations did not support a plausible claim that his conditions of confinement violated his constitutional rights saying, "[a]n actionable claim based on conditions of confinement requires serious harm, not mere discomfort." *Id.* at 490-91.

Here, the Plaintiff attests that Defendants "allow[ed] [smoking] on the premises and fail[ed] to enforce no smoking rules." Docket #49 at 5. To the extent Plaintiff claims ICCS allowed smoking inside the building, these allegations are belied by the undisputed record and Plaintiff's own statements made when she resided at ICCS. On August 6, 2013, Plaintiff stated that she "appreciate[s] that smoking is only allowed on the patio" and she "can avoid the smoking directly." Docket #83-7. Then, on August 21, 2013, Plaintiff stated, "even though one might argue that smoking is only limited to the 'outside patio,' no one can argue that the smoke and smoke smell lingers on smokers when they come inside." Docket #83-8 at 2. In addition, Defendants provided copies of both their non-smoking policy prohibiting smoking indoors (docket #83-5 at 23) and their report of resident violations of the policy for the period August 1, 2012 to August 1, 2013 reflecting

punishment from a verbal warning to termination from the program (docket #104-3).[5]  There is no admissible evidence demonstrating an issue of fact as to whether Plaintiff was exposed to cigarette smoke from residents smoking inside the facility.  Furthermore, Plaintiff provided no evidence to show how often she was in a position to inhale second-hand smoke from inmates violating the smoking policy.  *See George v. Smith*, 467 F. Supp. 2d 906, 924 (W.D. Wis. 2006).

It is undisputed that smoking was allowed on the outdoor porch at ICCS.  However, Plaintiff does not suggest that, during the 28 days she resided at ICCS, she was required to stand or sit next to staff or residents while they were smoking outdoors or that she was required to linger in the doorways close to where residents may have been smoking.  *See id.*

The question remains, then, whether issues of material fact exist concerning Defendants' requirement that Plaintiff reside for 22 days in a bedroom with five smokers, which Plaintiff alleges constitutes conditions posing a substantial risk of harm to Plaintiff's health.  Plaintiff argues that the smoke and odor lingering on her roommates caused her to wheeze, use her inhaler often, and eventually suffer an asthma attack for which she presented at a nearby hospital for medicine and nebulizer treatments.

It is undisputed that Plaintiff complained about the lingering smoke odor from her roommates in her first grievance dated August 6, 2013, approximately four days after she arrived, and asked for "one sleeping bedroom specifically designated for residents who aren't smokers."  Docket #83-7.  The next day, August 7, 2013, Director Heath responded asking Plaintiff to "provide medical documentation of your condition and what accommodations are required to your case

_____

[5]Plaintiff argues the report does not reflect the time period she resided at ICCS during the month of August 2013; however, even if the Defendants had provided information for that time period, the report itself lists residents who were punished for violating the no smoking policy and, thus, demonstrates that Defendants neither allowed smoking on the premises nor failed to enforce no smoking rules.

manager." *Id.* The director's request is in line with ICCS policy that "[r]oom or bed change requests will not be accepted. Exceptions may be made for documented medical conditions." Docket #83-5 at 21. On August 7, 2013, Plaintiff told her case manager that she would "work on getting this documentation." Docket #83-6 at 3. Plaintiff's case manager noted on August 14, 2013 that she was "approved to use the security phone today or tomorrow to call Dr." *Id.* at 5. In her second grievance dated August 21, 2013, Plaintiff stated, "when I called my last Dr. to get a note ... [t]hey wanted to charge me $40 [per] hour to find and 25 cents [per] page to copy my records since they were in storage. As you know, I can't afford that." Docket #83-3 at 3.

Plaintiff had an asthma attack on August 24, 2013 for which she was permitted to go to the hospital and receive medication and breathing treatments. Docket #83-6 at 8. She returned nearly five hours later with a note from the doctor saying that Plaintiff "should not be in a room where there is smoking. Please place her in a nonsmoking location." Docket #83-9 at 3.

While the doctor's note might serve as evidence that Plaintiff's in-room exposure to cigarette smoking can trigger her asthma attacks, Plaintiff has not established that the August 24, 2013 attack was actually caused by any lingering smoke and/or odor from her roommates after they had been smoking outside. In other words, it is unclear from the doctor's instruction whether Plaintiff could be exposed to any smoke and odor on a roommate's hair and clothes. *See, e.g., Oliver*, 77 F.3d at 160 (the asthmatic plaintiff's doctor did not require that he be celled only with nonsmokers). Plaintiff admits that she had allergies and asthma prior to her residence at ICCS and, as it is not uncommon for asthmatics to use inhalers, she has not established that her "unprecedented use" of the inhaler, as well as additional medication and nebulizer treatments at the hospital, necessarily resulted from her exposure to cigarette smoke odor in the bedroom.

Importantly, the plaintiff in the Tenth Circuit's opinion in *Johnson*, as well as plaintiffs in

other circuit courts who have addressed this issue (Eighth Amendment claims based on exposure to cigarette smoke), alleged direct exposure to actual second-hand smoke. *See, e.g., Powers*, 484 F.3d at 932; *Oliver*, 77 F.3d at 158; *Warren v. Keane*, 196 F.3d 330, 331-32 (2d Cir. 1999); *Reilly v. Grayson*, 310 F.3d 519, 520-521 (6th Cir. 2003); *Kelley v. Hicks*, 400 F.3d 1282, 1285 (11th Cir. 2005). Thus, it is likely here that Plaintiff's anecdotal evidence of exposure to lingering smoke and odor on her roommates' clothes and hair for 22 days would not rise to the level of those conditions discussed (and sometimes affirmed) as posing a risk of serious harm to other plaintiffs. *See Hunt v. Reynolds*, 974 F.2d 734, 735 (6th Cir. 1992) (prisoners have a right not to be exposed to environmental smoke that presents a serious risk to health and to be removed from places *where smoke hovers*), cited with approval in *Reilly*, 310 F.3d at 521; *see also Gill v. Smith*, 283 F. Supp. 2d 763, 767 (N.D.N.Y. 2003) (citing a colleague's opinion granting summary judgment where plaintiff failed to provide any evidence about the level of smoke in the facility, the degree of his exposure, and medical problems caused by exposure). However, even assuming Plaintiff's evidence suffices to demonstrate serious conditions, the Plaintiff fails to establish genuine issues of material fact as to whether Defendants were deliberately indifferent.

Essentially, Plaintiff must show that Defendants were aware of her medical condition, knew that second-hand smoke was exacerbating her condition and refused to do anything about it. *See George v. Smith*, 467 F. Supp. 2d 906, 924-25 (W.D. Wis. 2006). Relevant to this inquiry is the extent to which the risk of harm was obvious and whether the failure to implement a policy or policies to address that harm was likely to result in the violation of the plaintiff's constitutional right. *City of Canton v. Harris*, 489 U.S. 378, 390, 396-97 (1989) (O'Connor, J., concurring) (observing that whether policymakers had notice that a particular omission was substantially certain to result in a constitutional violation will inform the deliberate indifference analysis).

"Where the prison has a smoking policy, it is very difficult to demonstrate prison authorities are ignoring the possible dangers posed by environmental tobacco smoke." *Abuhouran v. Morrison*, No. 4:06 CV 1207, 2006 WL 2334748, at *7 (N.D. Ohio Aug. 10, 2006) (citing *Helling*, 509 U.S. at 36). Imperfect enforcement of a smoking policy cannot alone satisfy the subjective element of an Eighth Amendment claim. *Id.*; *see also Kelley*, 400 F.3d at 1285 (mere negligence in enforcing a non-smoking policy is insufficient to establish deliberate indifference).

Here, as set forth above, the Defendants imposed, and the Plaintiff acknowledged, a non-smoking policy inside the facility at ICCS. Furthermore, the report provided by Defendants reflects they have disciplined residents who violated the policy.

Moreover, the Plaintiff has not demonstrated Defendants' deliberate indifference to her requests to be moved to a room with non-smokers. It is undisputed that, in line with ICCS policy, Director Heath asked the Plaintiff to produce medical documentation to support her asthma complaints and the need to move; Plaintiff called a doctor in an attempt to obtain such documentation, but could not afford the cost to procure the documents; and, once Plaintiff presented the hospital doctor's note that she be "placed in a non-smoking location," Defendants moved the Plaintiff to a room with other residents they believed to be non-smokers.

Although the Plaintiff argues that Defendants should have had medical documentation from the prison facility from which she transferred, Director Heath attests, "[w]e do not receive complete medical information on clients, and we did not receive any medical files for Ms. Hammond. If a client wants us to consider a particular medical problem they may have, it is their responsibility to have their medical files provided to us." Heath Affidavit, ¶ 14, docket #83-2. Plaintiff neither attests nor argues that this policy was improperly applied to her.

Plaintiff also points to Defendant Echlenberg's August 27, 2013 note that "ICCS ... cannot

stop people from smoking and cannot accommodate a non-smoking room" in support of her position. However, Plaintiff does not dispute either Director Heath's testimony that Plaintiff was placed in a room with non-smokers after ICCS received the doctor's note (Heath Affidavit, ¶ 15, docket #83-2 at 5) or Defendant Echlenberg's August 29, 2013 note reflecting her statement to Plaintiff that "[s]he was already moved to a non-smoking room and nothing more can be done about this" (docket #83-6 at 9).

Finally, Plaintiff attests that "staff" ridiculed her calling her "Rainman" and "the boy in the bubble" and, on "the day of [her] asthma attack, two staff joked about whether they would make Ms. Hammond walk to the bus or if they would call an ambulance." Docket #49 at 5. Plaintiff did not identify these staff members and did not indicate that any of these "staff" members was Defendant Kildow or Defendant Echlenberg. Plaintiff must allege facts showing that each named Defendant acted with deliberate indifference, which means that the Defendant had subjective knowledge of a risk of serious harm and disregarded that risk by conduct that was more than mere negligence. *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004).[6] She did not do so here; therefore, the Court must conclude summary judgment is proper as to Plaintiff's Eighth Amendment claim for deliberate indifference to conditions posing a risk of serious harm.

## CONCLUSION

In sum, the Court finds that Defendants have met their initial burden under Fed. R. Civ. P.

---

[6] Of course, the standard is different, and more stringent, for the entity Defendants named herein (*see Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 694 (1978)); however, because the Plaintiff fails to demonstrate genuine issues of material fact as to whether she suffered a constitutional injury by any ICCS employees, the Court need not proceed to determine whether Plaintiff has additionally shown "(1) the existence of a municipal policy or custom, and (2) that there is a direct causal link between the policy or custom and the injury alleged." *See Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993) ("A municipality may not be held liable where there was no underlying constitutional violation by any of its officers.").

56, but Plaintiff has failed to demonstrate the existence of triable issues of material fact as to her remaining claim against Defendants for an Eighth Amendment violation.

Accordingly, based upon the foregoing and the entire record herein, the Defendants' Motion for Summary Judgment [filed March 29, 2015; docket #83] is **GRANTED**.  The Clerk of the Court is directed to close this case.

Dated at Denver, Colorado, this 2nd day of June, 2015.

BY THE COURT:

Michael E. Hegarty

Michael E. Hegarty
United States Magistrate Judge

24